## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **AMANDA CARTER, Individually and** | § | |
| **as next friend for G.C., a minor child,** | § | **CIVIL ACTION NO.:** _____ |
| **and MICHAEL CARTER,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **JUDGE:** |
| **v.** | § | |
| | § | |
| | § | **MAGISTRATE JUDGE:** |
| **CHAD DUPUY, Individually,** | § | |
| **SHERIFF JASON ARD, In His** | § | |
| **Official Capacity as the Public Entity** | § | |
| **Responsible for LIVINGSTON PARISH** | § | |
| **SHERIFF'S OFFICE, and LIVINGSTON** | § | |
| **PARISH SCHOOL BOARD,** | § | |
| | § | |
| **Defendants.** | § | |

## ORIGINAL COMPLAINT

NOW COMES AMANDA CARTER, natural mother and 'next friend' for G.C. and

MICHAEL CARTER, collectively Plaintiffs herein, by and through undersigned counsel, who file

this *Original Complaint.*

### I.   INTRODUCTION AND SUMMARY OF CLAIMS

1.      G.C. is a person with significant cognitive and physical disabilities. She has very

rudimentary and limited self-help skills and she is a person with a disability as

contemplated by Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 ("Rehab

Act" or "Section 504") and the Americans with Disabilities Act, 42 U.S.C. §12131, *et seq*

("ADA"). Now seventeen (17) years old, she lives with her natural mother, Amanda Carter,

stepfather, Michael, and siblings in Denham Springs, Louisiana.   She attends the

Livingston Parish Public School ("LPPS") system where she receives Special Education

services pursuant to the *Individuals With Disabilities Education Act,* 20 U.S.C. §1401 *et seq.* ("IDEA"). Over the relevant time period covered by this *Original Complaint* the LPPS failed to keep G.C. safe, grossly mismanaged her educational plan and overall failed to provide her necessary accommodations so she could benefit from public education services to the same extent as her peers.

2. Her mother complained to various School District Officials about these and other problems but with little response. Finally, one of the child's teachers became so upset she filed a complaint with the Louisiana Department of Children & Family Services ("DCFS") against Michael Carter. This is the first of many times District Officials *weaponized* DCFS as a personal tool in a vendetta against the Carters. When Amanda learned of the attack on her family, she went to the High School to pick her daughter up and bring her home, where she knew she would be safe. Instead, School Officials, with no legal authority to do so, told mother she could not pick her daughter up from school, restrained G.C. from leaving the school and forced her to leave. When mother refused the School District next *weaponized* the local Livingston Parish Sheriff's Department and called in Chad Dupuy, a School Resource Officer ("SRO") to force mother to leave the school. In the process he used both unnecessary and excessive force, and injured Ms. Carter in the process. Criminal charges were filed against Amanda.

3. Sadly, the retaliation by School Officials did not stop there. Shortly thereafter both Amanda and Michael were issued trespass warnings, meaning neither could come upon the campus for any purpose, whether it be for C.C. or her siblings. Worse yet, they removed G.C. from the public schools with no legal authority to do so. Amanda complained again, so School Officials finally relented and let G.C. return to school, as the facts below with

2

further demonstrate failed to address her unique and individualized needs.   In fact, Amanda learned her daughter was being mistreated from a staff person so in order to assure her daughter's safety, she put an audio recorder on G.C. What she heard was horrific and Amanda complained again.   School Officials figured out that Amanda had been taping the classroom activities and once again, retaliated by filing criminal charges against Amanda.

4.   Not surprisingly, the treatment by School Officials became public. The School Officials became angry and embarrassed so they retaliated and called DCFS on one or more occasions, each time alleging the Amanda was abusing her daughter.   The DCFS has never made a finding that either Amanda, or her husband Michael, had abused G.C.   Further, the criminal charges filed by the Parish because of the incident with the SRO were dropped. Even so, School Officials did not withdraw the trespass warning.   When asked to so, they refused and in fact still have not told the Carters how long this other threat of being charged with a crime will last, or what they need to do to have the warning dissolved.

5.   Based upon the above, federal claims of discrimination based upon disability are filed on behalf of G.C., pursuant to both the Rehab Act and the ADA against the Livingston Parish Public Schools.   Further, G.C. has claims related to the 4th and 14th Amendments to the United States Constitution.   Moreover, she has a state claim pursuant to "The Civil Rights Act Of Persons With Disabilities" pursuant Louisiana Revised Statue §46:2251 *et seq.* and also those founded in negligence

6.   Further, it is a violation of both the Rehab Act and ADA, as well as the First Amendment to the United States Constitution, pursuant to 42 U.S.C. Section 1983, for retaliating against a person who advocates on behalf of a persons with a disability.   Here, such claims are filed against the Public Schools on behalf of Amanda Carter, Michael Carter and G.C.

3

These retaliation claims on behalf of all Plaintiffs also are also found in a state law claim of negligence.

7.  Additionally, Amanda Carter has a separate claim against School Resource Officer Dupuy for unnecessary and excessive force, contemplated by both the 4th and 14th Amendments to the United States Constitution, pursuant to 42 U.S.C. Section 1983.

8.  In a related vein, Amanda Carter has a separate claim against the Livingston Parish Sheriff's Office, for the acts, omissions and negligence of School Resource Officer Dupuy pursuant to the legal theory of *Respondeat Superior.*

9.  Moreover, Plaintiffs seek equitable relief and ask the Court to order LPSB to put a camera in G.C.'s classroom; to withdraw the trespass warning against the Carters; and to stop contacting the Child Protective Services Division of the Department of Children & Family Services.

10. Plaintiffs reserve the right to file an amended complaint based upon additional or changed facts as they become known.

## II.  JURISDICTION

11. Jurisdiction is confered upon this Court pursuant to 28 U.S.C.A. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States of America, and relevant federal regulations issued thereunder.

12. Additionally, this Court has jurisdiction over all state law claims pursuant to 28 U.S.C.A. §1367.

## III.  VENUE

13. Venue is proper in this Court, as all events, acts and omissions that gave to Plaintiffs claims arose in this the Middle District of Louisiana.

4

## IV.    PARTIES

14.    Amanda Carter is an individual, of sound mind and over the age of majority, residing in Livingston Parish, Louisiana.

15.    Michael Carter is an individual, of sound mind and over the age of majority, also resides in Livingston Parish, Louisiana.

16.    Amanda Carter is the natural mother of G.C. As G.C. was born of 2005 and is currently still a minor, Ms. Carter brings forth claims on behalf of her daughter in a representational capacity and as next friend.    G.C. lives with Amanda and Michael Carter, and her siblings in Denham Springs, Louisiana.

17.    The Livingston Parish School Board ("LPSB") is a governmental entity within the State of Louisiana. It is a Local Educational Agency ("LEA"), within the meaning of state and federal law and the rules promulgated thereunder. Among other things it is required to provide the Student a safe and non-hostile educational environment and free of discrimination based upon her disability. Defendant LPSB is sued for injunctive relief, nominal, actual, and compensatory damages.

18.    Defendant Chad Dupuy is sued in his 'Individual Capacity' who, at all times relevant to this action, was a Sheriff's Deputy and working for Sheriff Jason Ard, with the Livingston Parish Sheriff's Office. Defendant Dupuy is sued in his individual capacity for damages (punitive, actual, and nominal) and attorneys' fees/costs.

19.    Defendant Sheriff Jason Ard is sued in his Official or Representational Capacity with the Livingston Parish Sheriff's Office for damages (actual and nominal).

## V.  ADMINISTRATIVE EXHAUSTION

20.    As all or part of the claims that G.C. complains of have their underpinnings in the Public

School's failure to provide her a *Free Appropriate Public Education* as contemplated by the *Individuals With Disabilities Education Act.*   Therefore, and commensurate with this cause of action, she has filed a *Request For A Due Process Hearing* with the Louisiana Department of Education, to satisfy the *Administrative Exhaustion* component of the IDEA. 20 U.S.C. §1415(l).

## VI.  STATEMENT OF FACTS

A.    BACKGROUND ABOUT G.C. AND HER FAMILY

21.    G.C. was born in March of 2005.   When just a mere infant her natural father abused her so severely that she experienced 'Shaken Baby Syndrome' which required a bilateral craniotomy.   She is diagnosed with a Traumatic Brain Injury; Global Developmental Delay, weak muscle Contractures, Left Hemiplegia, Cerebral Palsy, a Behavior Disorder and is Legally Blind.    As noted above she lives with her natural mother Amanda, who is married to Michael, and her siblings.

22.    She has no ability to care for herself and is non-verbal.   She requires assistance for all her self-help, toileting and personal needs.   She uses a wheelchair for her primary means of mobility, especially when traveling long distances at school, though she does benefit from walking several times a day.   Over time, the mobility in her left leg has decreased with her foot turning in to such a degree, that without supervision, she will often trip.

23.    Due to her many issues and inability to speak, she will often scream as a mode of communication when frustrated, will collapse onto her knees, refuse to walk and stiffen or throw herself on the floor. She has very limited fine motor skills and tendency to hit out, when trying to get the attention of others, even if in a playful manner. Due to ambulation issues and behavioral problems, she has a propensity to get injured.

24.     The Parish Schools historically have provided G.C. various related services such as Speech to help in communication, Occupational Therapy to address fine-motor and self-help skill issues, Physical Therapy for orthopedic and gross motor skills issues, as well as 'Social Work Services' in School.   It is reasonably believed the Parish Schools bill Medicaid for these, and other related services.

B.     THE FALL 2021 SEMESTER- AMANDA IS CONCERNED ABOUT SCHOOL SAFETY

25.     As noted above, G.C. had several surgeries related to her physical disabilities and the left side of her body in particular. It was well-known to staff that when G.C. was in her wheelchair, the seatbelt was to be fastened for safety purposes.   Further, that when G.C. was on the school bus, going to and from school, she required a special medically approved arm restraint.

26.     Nevertheless, during this period Amanda began to have concerns about the safety of her daughter coming, going and while at school as reported to her by a School employee.     In October Amanda sent a letter to the School complaining that G.C. was not being kept safe on the school bus and the medical arm restraint was not applied as ordered.

27.     In addition, Amanda learned that some other students with disabilities like G.C. and even Paraprofessionals and the Special Education Teacher, Jessica Bonura, would take turns sitting on G.C.'s lap when she was being transported across the campus in a wheelchair.

28.     Amanda complained to a number of persons including Principal Beth Jones; Steven Parrill, then Assistant Superintendent; Eric Penalber, Director of Special Education; Jody Purvis, then High School Instruction Supervisor and others about this and other problems. Nevertheless, no one ever responded to these concerns directly.

29.    Rather, Amanda was sent emails asking her to remove the Wheelchair Medical Restraint Orders but she would not agree to do so.    Principal Jones told Amanda that Ms. Bonura would address all her concerns, but Bonura never did so.

C.    THE SPRING 2022 SCHOOL YEAR- THE RETALIATION STARTS

30.    Amanda took pictures of her daughter being injured at school and on the bus, without the required arm restraints so she again complained to School Officials. Rather than respond to Amanda's concerns, the Public School staff started on a road of retaliation and weaponized the local Child Protective Services in an effort to chill Amanda's advocacy.

31.    Specifically, or about Feb. 4th, Ms. Bonura was given the authority by the Parish School Administrative Staff to follow G.C. home from school in an effort to 'find some dirt' on the Carters. When G.C. was getting off the school bus she was also trying to remove her diaper. Michael, gently tapped his daughter's hand in an effort to try and stop her from ripping off the dirty diaper.   Ms. Bonura observed this innocent interaction and contacted the Department of Child & Family Services ("DCFS") and reported that G.C. was being assaulted by Michael, her only father figure, for child abuse.

32.    On February 4, 2022, A Child Protective Services ("CPS") investigator showed up at Plaintiffs' house and Amanda told the investigator she would not speak with her without an attorney. Concerned for G.C.'s safety, Amanda and Michael rushed to LOHS to check G.C. out of school. Amanda called the Livingston Parish Sheriff's Office on her way to LOHS to seek their assistance.

D.    AMANDA CARTER IS A VICTIM OF EXCESSIVE FORCE BY A SHERIFF'S DEPUTY

33.    When the Carters arrived at LOHS on the afternoon of February 4, 2022 to pick G.C. up

from school, Amanda went into the LOHS office and spoke with administrative staff while Michael waited outside. Amanda was told that she was not allowed to leave with G.C. Amanda was understandably upset and insisted that she and Michael would not leave LOHS without G.C.

34.    Amanda opened the door to ask Michael to come in and talk to the LOHS staff with her. When Amanda opened the door, SRO Chad Dupuy walked in front of Michael and told Amanda to leave campus. Amanda said she had no problem leaving, but that she would not leave without G.C.

35.    SRO Dupuy then grabbed Amanda by the upper right arm, forcefully shoved her out of the door using both of his hands on her back, and threatened to arrest her. During this use of force, Amanda's wrist hit the office door. Video footage produced by LOHS confirms Amanda's account of this interaction.

36.    Dupuy used excessive force against Amanda without provocation or necessity.

37.    Given the absence of legal basis by LOHS to hold G.C., Amanda had a right—indeed a duty—to insist upon the return of LOHS. Had Amanda not insisted upon the return of G.C., Amanda would have been abandoning G.C., which would not have been in the best interest of the child.

38.    No reasonable officer would have used the force used by Dupuy.

39.    Amanda was then handcuffed and put into Dupuy's patrol car. Her arm immediately began to show bruising where Dupuy grabbed her and shoved her out of the office door. Dupuy saw that Amanda required medical attention so he began trying to negotiate with Michael, telling him that if Amanda agreed not to make a report about the incident and the injuries, "everything would go away." If Amanda did not agree to this, Dupuy would arrest her.

Amanda declined Dupuy's offer of quid pro quo, so she was issued summons for disturbing the peace, resisting arrest, and failure to leave when forbidden.

40. By the next day, Amanda's arm was black and blue and very painful to even a soft touch. She went to the emergency room and was put on a three (3) different medications for her injury. Amanda's left wrist continued to swell and felt cold, was tingling and beginning to go numb by two days after her encounter with Dupuy. Further medical treatment revealed that the force used by Dupuy was so significant that it caused bruising that put pressure on Amanda's carpal tunnel which, in turn, was caused the cold feeling, tingling, and numbness. Luckily, X-rays showed that nothing was broken in Amanda's arm or wrist.

41. As a result of the physical abuse, Amanda suffered pain in her left arm, swelling, tingling, coldness, and numbness in her left wrist, and aggravation of her carpal tunnel syndrome. Additionally, Amanda suffered emotional distress, pain and suffering, degradation, and invasion of her civil rights.

E.    THE RETALIATION WORSENS AND G.C. IS AFFECTED

42. A few days later, G.C. was back at LOHS.   Michael drove by and noticed that his daughter was again being pushed around campus without properly strapped in her wheelchair. Michael was particularly concerned when he saw his daughter put her fingers near the moving spokes of the wheel.   The Carters complained to many people about their concerns for G.C.'s safety while at school, including Dr. Penalber, the Director of Special Education and separately, to the Parish School System Superintendent.   The Carters formally requested that the High School put a camera in G.C.'s classroom.   They refused. The family formally requested that the High School collect data related to the various services she was supposed to get.   They failed to do that also.

10

43.    The retaliation worsened, so much so that SRO Dupuy harassed G.C.'s brother who also attended LOHS.   Soon after, Amanda received a letter from Beth Jones, School Principal, banning Amanda from School Grounds, and given a 'Trespass Warning" that if she stepped foot on a campus she would be arrested. A few days later Michael received the same trespass letter. There was nothing in the letter about what either had actually done to warrant the warning, or how long the warning would last, or what she needed to do to have it lifted.

44.    Based upon the ongoing disagreements between school officials and the family, Dr. Penalber banned G.C. from LOHS and would not allow her back on campus.   G.C. was also banned from attending the Prom and other activities provided to her peers.   She received absolutely no academic, non-academic or related services during this period.

45.    During the same period the Carters re-urged that a camera be put on the classroom as a condition of attendance.   The Assistant Superintendent again refused the request.

46.    Finally, G.C. was permitted to go back to a different school, the Denham Springs Freshman High School.   The records reflect that she was bruised a number of times during behavioral breakdowns through April and May of the Spring semester because there were not enough staff to serve her, the staff there were unfamiliar with her needs, and, in any case, they failed to implement behavioral plan.

47.    Amanda formally appealed, on behalf of herself and husband being banned from all school activities, both on and off, school grounds. Instead, and without any clear reason why, they were told it would extend through the entire Fall 2022 and Spring 2023 Semesters.   Once again she was not provided any information about what she had to do to get off the ban or how long it would last.

48.  The Department of Family & Protective Services completed their investigation and made no findings of abuse or neglect against Amanda or Michael, or anybody in the household for that matter.   Nevertheless, the retaliation continued and worsened for the next school year.

F.    THE WEAPONIZATION OF CALLING CHILD PROTECTIVE SERVICES CONTINUES

49.  On August 23, 2022, the criminal charges filed by SRO Dupuy at the request of the Parish Schools were dropped by the State. Nevertheless, the Parish Schools refused to remove, let alone re-visit the trespass warning. G.C. returned to the LOHS in the 2022 Fall semester. Shortly after school began, a staff member from LOHS called DCFS to accuse the Carters of abuse because they noticed a small bruise on G.C.

50.  When the DCFS worker came out to interview the family, Amanda learned that G.C. was the only child in her classroom, G.C. had no desk, G.C. ate breakfast and lunch alone in her classroom unlike her peers, G.C. did not attend recess, and was excluded from activities with other children. Apparently, G.C. was again being punished because of her parent's advocacy on her behalf and request that a camera be put in the classroom.

51.  A few days later Amanda learned that G.C.'s classroom, where she is the only student, is on the second floor. She was concerned that if the elevator is not functioning during a fire, it could be a life-altering problem.   There is no safety or evacuation plan for G.C.   LOHS failed to assure Amanda that her daughter is ambulated through the school in a wheelchair. Evidently, staff finds the use of the wheelchair, arm restraint and safety measures too burdensome.

52.  Amanda wasso concerned for her daughter's safety and being blamed for any injury her

daughter may sustain at school, that she put a tape recorder into her wheelchair.   On or about September 1, 2022, Amananda listened to a recording taken that day.   It evidences that the Parish Schools failed to provide G.C. any academic, related services or physical education services that day.   Amanda suspected they failed to do so for many months.

53.    Worse yet, Amanda can also hear that staff are changing G.C.'s diaper on the floor as there is no bathroom or changing table. She hears staff laughing during the process and commenting they are not changing G.C.'s diaper enough. Amanda learns that staff are doing daily body searches of G.C. when she arrives at school in an effort to find evidence of bruising at home, so they could file other false reports with the DFPS, which they do over and over.

54.    One day G.C. comes homes with significant bruising even though when left for school that day she was fine.   The Carters were so concerned they brought her to the hospital to assure nothing was fractured or broken.

55.    Amanda continued to listen to the audio tapes.   As best as she can tell her daughter has received no educational services for the better part of a month save for two brief physical education sessions.   In the previous year she had participated in what is termed 'the REACH program' so as to socialize with other disabled peers throughout the day.   G.C. does not receive benefit of this program or socialize with any other students.

56.    Staff at LOHS have taken to strip searching G.C. when she arrives at school and continue to report Amanda to DCFS for child abuse.

57.    Amanda reasonably believes the Parish Schools have continued to bill G.C.'s Medicaid for various therapeutic services, even though they have not provided such related services as the educational plan denotes.

13

58.   In addition, School Staff have also accused Amanda of the illegal use of a wire–wiretapping, essentially–for her efforts to protect her daughter and monitor her safety in the classroom.   They have again filed criminal charges against her.

59.   Amanda continues to request a camera be placed in her daughter's classroom, but the Parish Schools refuses to do so.

60.   Amanda continues to complain publicly and on social media that the Parish Schools is failing to provide her daughter the therapies and related services she deserves.

61.   The school has refused to allow Amanda and Michael to participate in school activities such as offsite field trips in retaliation for her advocacy on behalf of her daughter.

62.   The intent of the LPSB, through its employees, is further evidenced by the false and malicious statements by its employees about Amanda.

63.   For example, on Friday, September 2, 2022, Ms. Bonnie Boulton, Special Education Program Development Coordinator, sent an email to several individuals. In the email, Ms. Boulton who, upon information and belief was referring to Amanda, stated in relevant part as follows:

> The mom was arrested at school last year. She just went to court and pled guilty to all charges against her. She went on social media, claiming the SRO manhandled her, and went so far as to offer money for any pictures that people would send her showing the SRO in inappropriate situations with students. She has received none.

64.   Multiple statements by Ms. Boulton in the above are patently false.

65.   Amanda did not "plead guilty to all charges against her." To the contrary, the criminal charges against Amanda were dropped.

66.   Nor did Amanda ever go on social money and "offer money for pictures[.]"

67.   It is well established that false statements of criminality are defamatory *per se*.

14

68. The above false statements by Ms. Boulton are part of pattern of conduct of harassing and discrimination against Amanda on account of her disability-related activism on behalf of G.C.

69. In an effort to further intimidate, School staff have posted confidential and FERPA protected information about G.C. on social media and in the local press.   They have done so in response to Amanda's attempts to seek assistance in redressing her grievances and finding someone to assist her in advocating for G.C.

## VII.  CLAIM I - VIOLATIONS OF THE UNITED STATES CONSTITUTION

### By Amanda, Michael, and G.C.

*(as to the LPSB and Chad Dupuy)*

A.    CLAIMS RELATED TO THE 1st AMENDMENT TO THE US CONSTITUTION

70. Amanda Carter and Michael Carter each have a constitutional right to redress grievances before the Parish Schools without fear of retaliation.   The acts and omissions of the Parish Schools evidence that both the Student and the Carter's were each victims of retaliation because of the advocacy pursued on G.C.'s behalf.   Separate from the claims of retaliation pursuant to the ADA and Rehab Act, they each all have a plausible claim under the 1st Amendment as well.

B.    CLAIMS RELATED TO THE 4th AMENDMENT TO THE US CONSTITUTION

1.    On Behalf of G.C.

71. G.C. has a liberty interest in bodily integrity and constitutional right to be free from unnecessary and excessive restraints while at school.   Nevertheless, staff with the LPSB affixed restraints against G.C. which were unnecessary and in addition and in the alternative excessive.

15

72. Such acts and omissions by the LPSB were a moving force in violating her rights as contemplated by 4th Amendment of the Constitution of the United States, for which she seeks recovery pursuant to 42 U.S.C. §1983.

      2.     On Behalf of Amanda Carter

73. Amanda Carter likewise has a liberty interest in bodily integrity and constitutional right to be free from unnecessary and excessive restraints.  Nevertheless, Sheriff's Department Deputy and School Resource Officer Dupuy, attempted to affix unnecessary restraint upon Amanda Carter, and in the process used excessive force and injured her thereby.

74. Such acts and omissions by SRO Dupuy were a moving force in violating her rights as contemplated by 4th Amendment of the Constitution of the United States, for which she seeks recovery against him in his Individual Capacity, pursuant to 42 U.S.C. §1983.

C.    CLAIMS RELATED TO THE 14TH AMENDMENT TO THE U.S. CONSTITUTION

      1.     Due Process Claims

75. G.C. has a constitutional right to Due Process pursuant to the 14th Amendment of the Constitution of the United States. Here such rights were violated by the LPSB as it failed to sufficiently train staff, for which she seeks recovery pursuant to 42 U.S.C. §1983.

76. In addition, G.C. has a constitutional right to Due Process pursuant to the 14th Amendment of the Constitution of the United States.  Here such right was violated by the LPSB for failure to sufficiently supervise staff, for which she seeks recovery pursuant to 42 U.S.C. §1983.

77. Further, G.C. has a protectible property interest in her education, also pursuant to the Due Process Clause of 14th Amendment of the Constitution of the United States.  Here such right was violated by the LPSB when they removed her from school without due process,

16

for which she seeks recovery pursuant to 42 U.S.C. §1983

### 2. Equal Protection Claim

78. G.C. failed to receive equal access to public educational benefits as compared to other students. Such failures by LPSB were a moving force in violating the rights of the G.C. as a class of one, as contemplated by the Equal Protection of the Fourteenth Amendment of the Constitution of the United States for which she seeks recovery pursuant to 42 U.S.C. §1983.

### 3. Policy And Practice

79. During the relevant time period contemplated by this cause of action, the LPSB, by and through its designees—had an actual policy, practice, and custom of conscious and deliberate indifference to federal and state law, federal and state administrative directives, regarding the treatment of G.C. and her parents, and such failures were a moving force in the injuries to both she and her parents individually, seek recovery for pursuant to 42 U.S.C. §1983.

## VIII.   CLAIM 2- VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT By Amanda and G.C.

*(as to solely the LPSB)*

80. At all times relevant to this action, Title II of the ADA, 42 U.S.C. § 12131, *et seq*. has been in full force and effect and has applied to the LPSB's conduct.

81. At all times relevant to this action, the U.S. Department of Justice regulations implementing Title II of the ADA, 28 C.F.R. Part 35, have been in full force and effect and have applied to the LPSB's conduct.

82. At all times relevant to this action, G.C. has been substantially limited in several major life

17

activities, and as such is an individual with a disability within the meaning of the ADA, 42 U.S.C. § 12102(2).

83. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

84. Federal regulations implementing Title II of the ADA provide that a public entity may not "(i) deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; (ii) afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; [or] (iii) provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." 28 C.F.R. § 35.130(b)(1).

85. Federal regulations implementing Title II of the ADA further provide that "a public entity shall operate each service, program, or activity so that the service, program or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a).

86. Federal regulations implementing Title II of the ADA further provide that a public entity may not "Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service." 28 C.F.R. § 35.130(b)(1)(vii).

87. LPSB violated Title II of the ADA by excluding G.C. from participation in or denying the

18

benefits of services, programs, or activities of the public school system by reason of her disability, and subjecting her to discrimination by LPSB by reason of her disability.

88. LPSB violated Title II of the ADA because G.C. was denied the benefit or services, programs and activities in her public school in violation of the ADA, 42 U.S.C. § 12132.

89. By and through their acts, omissions and denials set forth above, the LPSB discriminated against G.C. on the basis of her disability, in violation of Title II of the ADA and its implementing regulations.

90. G.C. is therefore entitled to declaratory relief, compensatory and nominal damages, and attorneys' fees, costs, and expert expenses pursuant to the ADA.

## IX.    CLAIM 3- VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT OF 1973

### By Amanda and G.C.

*(as to solely the LPSB)*

91. At all times relevant to this action, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, has been in full force and effect and has applied to the LPSB's conduct.

92. At all times relevant to this action, the United States Department of Health and Human Services ("HHS") regulations implementing Section 504 of the Rehabilitation Act, 45 C.F.R. Part 84, have been in full force and effect and have applied to CPSB's conduct.

93. At all times relevant to this action, G.C. had substantial limitations in several major life activities including speaking, thinking, brain function, and walking, and was an individual with a disability within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(9).

94. At all times relevant to this action, LPSB has been offering programs, services, activities, or accommodations receiving federal financial assistance pursuant to 29 U.S.C. § 794(b).

95.     Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

96.     The RA extends relief to "any person aggrieved" by discrimination in violation thereof. 29 U.S.C. § 794a(a)(2).

97.     LPSB discriminated against G.C. based upon her disabilities in a number of manners and particulars.  For instance, they failed to provide her safe and non-hostile educational environment. Further, they grossly mismanaged her educational plan. Moreover, they failed modify servies and accommodate her disabilities. As a result, and individually or in concert with each other, G.C. was denied the benefit or services, programs and activities in her public school by LPSB in violation of Section 504 of the RA, 29 U.S.C. § 794.

98.     LPSB discriminated against G.C.., on the basis of disability, in violation of 29 U.S.C. § 794.

99.     Thus G.C. is entitled to seek and recover compensatory and nominal damages for the injuries and loss they she sustained as a result of LPSB's discriminatory conduct as hereinbefore alleged, pursuant to 29 U.S.C. § 794(a).

100.    G.C. is further entitled to an award of attorneys' fees, and costs (including expert expenses) pursuant to the RA, 29 U.S.C. § 794(a).

## X.    CLAIM 4- VIOLATIONS OF LOUISIANA CIVIL RIGHTS FOR PERSONS WITH DISABILITIES ACT

### By Amanda and G.C.

*(as to solely the LPSB)*

20

101. Likewise, and in addition and in the alternative to the above, the Parish Schools is liable to G.C. for discrimination based upon disability pursuant to Louisiana Revised Statue §46:2251 pursuant to what is termed the *Civil Rights For Persons With Disabilities Act*.

102. At all times relevant to this action, LA. REV. STAT. ANN. § 46:2251 et. seq., (hereafter "the Civil Rights Act") has been in full force and effect and has prohibits discriminatory conduct of the Parish Schools..

103. In addition, and likewise at all times relevant to this action, G.C. has multiple limitations to major life activities, and accordingly, is an individual with a disability within the meaning of the Civil Rights Act, LA. REV. STAT. ANN. § 46:2253(12).

104. At all times relevant to this action, Parish Schools has qualified as a place of public education as defined by LA. REV. STAT. ANN. § 46:2253(4) by virtue of supplying educational services to the general public, soliciting and accepting the patronage of the general public, or having been supported directly or indirectly by government funds for educational purposes.

105. LPSB discriminated against G.C. by excluding her from and denying her the benefits of the LPSB's programs or activities. LPSB's employees excluded, denied benefits to, and otherwise subjected G.C.to discrimination, on the basis of her status as a person with a disability.

106. G.C. was injured by the LPSB's discrimination and brings suit under the Civil Rights Act to recover compensatory damages for the injuries and loss she sustained as a result of the LPSB's discriminatory conduct and intentional discrimination herein.

107. By and through the factual narrative outlined above, LPSB intentionally discriminated against G.C.

108.    By and through the factual narrative outlined above, LPSB's failure to accommodate was not as a result of a simple oversight. Instead, LPSB's failure to accommodate G.C. was a purposeful decision.

109.    By and through the factual narrative outlined above, G.C. prays for a recovery of compensatory/actual damages sustained by G.C. through the date of trial.

110.    In addition to compensatory damages, G.C. prays for and seeks nominal damages. It is G.C.'s position that an award of nominal damages would confer significant civil rights to the public, as a judgment in her favor against the LPSB, regardless of the amount, would deter educational entities from discriminating against disabled individuals in the future, would lead to change to LPSB's policies/practices, and would spark public discussion on the need to accommodate individuals with disabilities.

**111.**    G.C. is further entitled to relevant declaratory and injunctive relief, as well as an award of attorneys' fees, costs, and disbursements pursuant to the LCHR. LA. REV. STAT. ANN. § 46:2256.

## XI.   CLAIM 5- BREACH OF CONTRACT

### By Amanda and G.C.

*(as to solely the LPSB)*

112.    The United States has a contract with the State of Louisiana and by extension the LPSB to provide specific type of services to students like G.C., a Third Party Beneficiary. Additionally, the LPSB had a contract with G.C. to provide her educational and related services commensurate with federal and state law, including but not limited to Medicaid.

113.    LPSB breached their agreement with the federal and state government, to which G.C. was a Third Party Beneficiary and she was injured thereby.

22

114.    The LPSB breached their agreement with G.C. to provide certain academic, non-academic and related services, and she was injured thereby.

### XII.    CLAIM 6 – NEGLIGENCE

### By Amanda and G.C.

*(as to Chad Dupuy, Sheriff Ard, and LPSB)*

115.    Amanda Carter and G.C. repeat and reiterate every allegation set forth in the foregoing paragraphs of this Complaint with the same force and effect as if more fully set forth at length herein.

116.    Defendant Dupuy had a duty, as a law enforcement officer, to use only appropriate and necessary force.

117.    By using excessive and wanton force, Dupuy breached his legal duty to Amanda.

118.    The breach of their duty caused Amanda physical injury, pain and suffering, and emotional distress.

119.    Dupuy's actions were the legal and proximate causes of Amanda's injuries.

120.    Additionally, Amanda brings suit against Sheriff Jason Ard for negligence.

121.    First, Sheriff Jason Ard is liable to Amanda under the theory of *respondeat superior*.

122.    Second, Sheriff Jason Ard is liable to Amanda for his own negligence.

123.    Upon information and belief, Sheriff Jason Ard failed to adequately screen Dupuy and/or performed inadequate vetting of his violent tendencies.

124.    Upon information and belief, Sheriff Jason Ard failed to adequately train Dupuy on the appropriate use of force.

125.    As a result of these failings, both defendants caused injury to Amanda.

126.    Finally, Amanda and G.C. sue the LPSB for negligence as to the pattern of harassment,

unnecessary reports to the DCFS, and false statement(s) about Amanda internally and/or to third parties.

127.    The LPSB had a duty to treat parents and students with respect and dignity, only make reports to the DCFS when necessary, and not disseminate false statements.

128.    By and through the actions of its employees, the LPSB has breached its duties to Amanda and G.C.

129.    By and through the actions of its employees, the LPSB has caused Amanda and G.C. harm in the form of mental and emotional distress and damage to reputation, image, and character.

130.    Amanda and G.C. seek compensatory damages from the above-named defendants for negligence.

## XIII.    PLAINTIFFS REQUEST TRIAL BY JURY

131.    Plaintiffs request a trial by Jury as to all claims and factual issues.

## XIV.    DAMAGES AND RELIEF REQUESTED

132.    As a direct and proximate result of Defendants' conduct, Plaintiffs suffered the above noted injuries and seek following damages, which they are entitled to recover herein, to the full extent permitted by the claims alleged:

a.    For G.C. only, loss of equal access to educational opportunities; .

b.    Normal, incidental and nominal damages;

c.    Restitution including costs of cure;

d.    Reimbursement for past medical expenses;

e.    Reimbursement for future medical expenses;

f.    Reimbursement for past mental health expenses;

g.    Reimbursement for future mental health expenses;

h.    Damages for past pain and discomfort;

i.    Damages for future pain and discomfort;

j.    Reimbursement for costs related to past mental anguish;

k.    Reimbursement for costs related to future mental anguish;

l.    Actual pecuniary losses in the past due to the retaliation experienced;

m.    Actual pecuniary losses for a reasonable period in the future due to the retaliation experienced;

n.    As to all the claims, the various out-of-pocket expenses incurred by Plaintiffs but for the acts and omissions of the Defendants;

o.    Punitive damages against defendant Dupuy for constitutional claims;

p.    Attorneys' fees and costs of litigation; and

q.    Injunctive and/or equitable relief in ordering the LPSB to put a camera in G.C.'s classroom;

r.    Injunctive and/or equitable relief in ordering the LPSB to withdraw the trespass warning against the Plaintiffs;

s.    Injunctive and/or equitable relief in ordering the LPSB to stop contacting the Child Protective Services division of the Department of Children & Family Services;

t.    Any such further relief that the Court or a Jury, or both can give, whether as to law or in equity or as to both.


[signature block on following page]

25

Respectfully Submitted,

**BIZER & DᴇREUS, LLC**
*Attorneys for Plaintiff*

/s/ Emily A. Westermeier
ANDREW D. BIZER (LA # 30396)
GARRET S. DᴇREUS (LA # 35105)
EMILY A. WESTERMEIER (LA # 36294)
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996
Email: ewest@bizerlaw.com
          andrew@bizerlaw.com
          gdereus@bizerlaw.com