**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

**AMANDA CARTER, ET AL.**

                                                **CIVIL ACTION**

**VERSUS**

                                                **NO. 23-69-JWD-EWD**

**CHAD DUPUY, Individually, ET AL.**

**RULING AND ORDER**

**I.    INTRODUCTION**

       This matter comes before the Court on the *Motion for Summary Judgment* (Doc. 37) by defendants Jason Ard, Sheriff of Livingston Parish, State of Louisiana, ("Ard" or "Sheriff Ard") and Chad Dupuy ("Dupuy") (collectively, "Defendants"). Plaintiffs Amanda and Michael Carter ("Plaintiffs" or the "Carters") oppose the motion, (Doc. 45), and Defendants have filed a reply, (Doc. 49). Oral argument is not necessary.

       Plaintiffs allege that Deputy Dupuy used excessive force against Amanda Carter during a twenty-second encounter at Live Oak High School ("Live Oak") on February 4, 2022. Surveillance video from Live Oak captured the incident made subject of this litigation. (Defendants' *Local Rule 56 Statement of Material Facts to Which Movants Contend There is No Genuine Issue* ("*DSMF*") ¶ 1, Doc. 37-6; *Plaintiff's Response to [DSMF]* ("*PRDSMF*") ¶ 1, Doc. 45-1.)[1] But that video footage is not conclusive. What it does show, however, is Dupuy grabbing and pulling Mrs. Carter's right arm to physically remove her from the school office. (*Plaintiff's Statement of Material Facts* ("*PSMF*") ¶ 35, Doc. 45-1; Defendants' *Reply Statement of Facts* ("*DRSF*") ¶ 35,

---

[1] When a paragraph of the *DSMF* is cited alone, then that fact has either been admitted in the *PRDSMF*, or it has been qualified or denied in such a way as to have it be deemed admitted as not properly controverted. *See* M.D. La. Civ. R. 56(c), (f).

Doc. 49-1.)[2] Then, when she braced herself and planted her feet to keep herself in place, Dupuy shoved Mrs. Carter with both of his hands to fully push her outside. (*PSMF* ¶¶ 36–37, Doc. 45-1.)

Plaintiffs bring claims against Dupuy for excessive force in violation of the Fourth and Fourteenth Amendments under 42 U.S.C. § 1983 and for assault, battery, and negligence under Louisiana state law. (*Am. Compl.* ¶¶ 17–25, Doc. 21.) Plaintiffs also plead against Sheriff Ard claims of *respondeat superior* and negligent screening and training. (*Id.* ¶¶ 26–38.)

Having carefully considered the law, the facts in the record, and the arguments and submissions of the parties, Defendants' motion will largely be denied. The Court finds that a reasonable jury could conclude, when construing the totality of the circumstances in a light most favorable to Plaintiffs and when drawing reasonable inferences in their favor, that Dupuy used excessive and unreasonable force against Mrs. Carter, which resulted in a cognizable injury. The Court bases this conclusion on the following: (1) Mrs. Carter had purportedly violated only two minor misdemeanors; (2) she posed no immediate threat to the safety of the officers or others, given (a) that Dupuy testified that she did not threaten him with a weapon or brandish one at him; (b) that Dupuy could not hear what took place in the office before the use of force; and (c) that the video shows her upset but otherwise not making a disturbance or threating anyone when the force was applied; (3) she was not actively resisting arrest or attempting to evade arrest by flight, and any resistance she did show to Dupuy was inconsequential and passive; and (4) Dupuy's use of force did not involve a measured and ascending response to Mrs. Carter's noncompliance, given the fact that the encounter lasted only twenty seconds and given his failure to engage in hardly any negotiations with Mrs. Carter before using force, even though negotiations were more appropriate

---

[2] *PSMF* are listed below *PRDSMF* in Doc. 45-1 at 4–10. When a paragraph of the *PSMF* is cited alone, then that fact has either been admitted in the *DRSF*, or it has been qualified or denied in such a way as to have it be deemed admitted as not properly controverted. See M.D. La. Civ. R. 56(c), (f).

given the minor nature of the offense and the minimal threat Mrs. Carter posed of danger or flight. The Court further finds that Dupuy is not entitled to qualified immunity, as he had fair notice that his conduct was unlawful under clearly established law. Thus, Plaintiffs' Fourth Amendment claim survives to trial.

For the same reasons, Plaintiffs' state law claims against Dupuy survive. A reasonable jury could conclude that Dupuy negligently applied excessive force, battered, and assaulted Mrs. Carter and that Sheriff Ard is vicariously liable for this conduct.

Some claims, however, will be dismissed. Plaintiffs' Fourteenth Amendment claim was made out of an abundance of caution, in the event that the Court finds that Mrs. Carter was not seized. Since Defendants concede that Mrs. Carter was in fact seized, this claim will be dismissed. Likewise, Plaintiffs do not object to dismissal of their claim against Ard for negligent screening and training, so the motion will be granted on these issues.

## II.  RELEVANT FACTUAL BACKGROUND

### A.  Before the Carters and Dupuy Arrived at Live Oak

On February 4, 2022, an agent with the Louisiana Department of Children and Family Services ("DCFS") came to the residence of plaintiffs, Amanda and Michael Carter, to investigate claims of child abuse involving their daughter, G.C. (*DSMF* ¶ 2, Doc. 37-6.) DCFS agents told them that someone at G.C.'s school, Live Oak, had made a report to DCFS. (*PSMF* ¶ 1, Doc. 45-1.)

G.C. has cerebral palsy, is non-verbal, and has the cognitive function of a two-year-old. (*Id.* ¶ 2.) This visit from DCFS came after months of Mrs. Carter repeatedly raising issues with the school about G.C.'s educational experience and mistreatment by teachers and school staff. (*Id.*

¶ 3.) When a DCFS worker showed up at their home, the Carters knew that someone at the school had made a report against them to be "vindictive." (*Id.* ¶ 4.)

In response to the agent's request to speak with them about a report of something that had occurred at the child's school, the Carters told that agent, "I don't know what to say to you, ma'am," and left their residence to go to their daughter's school to retrieve her. (*DSMF* ¶ 3, Doc. 37-6; *see also PSMF* ¶ 5, Doc. 45-1.)

However, at no point during the visit from the DCFS worker or subsequently were the Carters provided with any court order or warrant authorizing DCFS to remove G.C. from their custody. (*PSMF* ¶ 6, Doc. 45-1.) Further, on the drive to school, Mrs. Carter called the Livingston Parish Sheriff's Office ("LPSO") to ask for an officer to meet her at the school to file a complaint against one of G.C.'s teachers. (*Id.* ¶ 7.)

Around this time, a DCFS agent contacted Live Oak and informed them that the Carters were coming to the school to pick up their daughter. (*DSMF* ¶ 4, Doc. 37-6.) Officials at Live Oak were instructed by DCFS that under no circumstances was the school to release Plaintiffs' daughter to their custody. (*Id.* ¶ 5; *see also PSMF* ¶ 8, Doc. 45-1.)

In response to the call from DCFS, Live Oak Assistant Principal Gary Jones and others began to secure the exterior doors of the school so that the parents would not be able to enter. (*DSMF* ¶ 6, Doc. 37-6.) Mr. Jones contacted the School Resource Officer assigned to Live Oak, Deputy Dupuy of the LPSO , stating "We have a problem in the front office. You need to come up here to just – so I can tell you what's going on." (*Id.* ¶ 7.) Deputy Dupuy also received a call from the LPSO dispatcher informing him that there was a parent coming to the school to file a complaint against a teacher. (*PSMF* ¶ 12, Doc. 45-1.)

4

However, again, Jones testified that he received no documentation or a court order authorizing or directing the school to withhold G.C. from her parents beyond a verbal order he received over the phone. (*PSMF* ¶ 9, Doc. 45-1.) And Mrs. Carter has no knowledge that any such court order authorizing removal of G.C. from her parents' custody was ever issued. (*Id.* ¶ 10.)

**B.  At the School, Before the Use of Force**

Dupuy testified that, when he arrived, Mrs. Carter was not there, but he learned that "DCFS called the school, spoke to the Assistant Principal, and DCFS instructed the school not to release [the child] to [the Plaintiffs] due to issues at the home, and they were refused to be let into the home." (Dupuy Dep. 32, Doc. 37-4.) He continued, "[S]o[,] DCFS was on their way to the school to get [the child], and DCFS said that the parents left the house and [were] on their way to the school to get her, but were . . . instructed by DCFS not to release her to the parents." (*Id.*)

Plaintiffs emphasize the conflict between Dupuy's account and Jones's. Jones stated by affidavit that he "immediately contacted . . . Dupuy, to be on alert. Other school administrators and I also began locking exterior doors to the school and office in preparation for [Plaintiffs'] arrival." (Jones Decl. ¶ 6, Doc. 37-3.) Mrs. Carter arrived at the school and was able to enter the office before the door was locked, while Mr. Carter remained outside. (*Id.* ¶ 7.)

Plaintiffs also stress a conflict in testimony about whether Dupuy arrived before the Carters, citing the surveillance video, (Def. Ex. B-1, 1:24:33 p.m.–1:24:41 p.m.), and Mr. Carter's testimony that Dupuy "pulled in behind [them]" and that they "were there before him[,]" (M. Carter Dep. 34, Doc. 45-3).

In any event, it's undisputed that Mrs. Carter arrived at the school and walked into the front office while Deputy Dupuy remained outside with Mr. Carter. (*DSMF* ¶ 9, Doc. 37-6; *see also PSMF* ¶ 13, Doc. 45-1.) While Deputy Dupuy and Mr. Carter stood outside the office, Mr. Carter

explained to Deputy Dupuy that the Carters were at the school to pick up their daughter. (*PSMF* ¶ 14, Doc. 45-1.)

After Mrs. Carter entered the office, she informed the secretary that she would be checking G.C. out of school. (*Id.* ¶ 15.) While Mrs. Carter waited in the office, she was on the phone with her grandmother, Virginia Ford. (*Id.* ¶ 16.)

The secretary informed Mrs. Carter that she was not allowed to take G.C. home. (*Id.* ¶ 17.) Mrs. Carter asked the secretary what authority she had to withhold G.C. from her parents, and the secretary stated that she was directed by DCFS not to release G.C. (*Id.* ¶ 18; *DSMF* ¶ 10, Doc. 37-6.)

After that, the stories again diverge. According to Jones, Mrs. Carter "became increasing[ly] agitated that she was unable to take her child and began to yell and use profanity," (Jones Decl. ¶ 8, Doc. 37-3). Jones further stated that Carter continued to yell and use profanity and walked toward the door to scream outside, at which point Deputy Dupuy followed her back into the office. (*Id.* ¶ 10.)

But Plaintiff raises more questions of fact here. Mrs. Carter testified that, as things unfolded in the office, she was "upset understandably so, and [she] told [her] grandmother [on the phone,] 'They won't give me my fucking daughter.'" (A. Carter Dep. 75, Doc. 37-5.) Additionally, when the secretary refused Mrs. Carter's request to pick up her daughter, Mrs. Carter expressed her concern that the school was kidnapping and holding G.C. hostage. (*PSMF* ¶ 20, Doc. 45-1.) Mrs. Carter's conversation with the office secretary was focused solely on her desire to pick up her daughter. (*Id.* ¶ 22.) Carter testified that the office secretary was the only person in the office while she was on the phone with her grandmother. (A. Carter Dep. 75, Doc. 37-5.) She further said the same in her declaration: the only people she saw in the office were the school secretary and another

6

one or two school employees, and she did not see Jones while she was in the office that day. (Carter Decl. ¶¶ 5–6, Doc. 45-5.) She also said that she did not raise her voice at all in the school office. (*Id.* ¶ 9.) Thus, Plaintiff claims (1) there are questions of fact about (a) who was in the office; (b) whether she was yelling; (c) whether she used a single profanity or more; and (2) Jones has no personal knowledge of what happened while she was in the office. (*See PRDSMF* ¶ 10, Doc. 45-1.)

As stated above, the video is inconclusive. There is no audio on the surveillance footage, so it's unknown whether Mrs. Carter is yelling or using more than a single swear word. Moreover, her body language reflects that she is upset, but it does not appear that she is uncontrollable, unruly, or yelling.

That aside, it is undisputed that, when the Carters arrived at the school, Deputy Dupuy had no information about any court order prohibiting the Carters from picking up G.C. from school, though, again, Dupuy testified that he was informed by school administrators that DCFS instructed them not to release G.C. to the Carters. (*PSMF* ¶ 23, Doc. 45-1; *DRSF* ¶ 23, Doc. 49-1.) Deputy Dupuy did not speak to anyone from DCFS before engaging with the Carters. (*PSMF* ¶ 24, Doc. 45-1.) Deputy Dupuy was standing outside the closed school office doors with Mr. Carter while Mrs. Carter spoke to the secretary about retrieving G.C. (*Id.* ¶ 25.) Deputy Dupuy could not hear the conversation in the office from outside the closed doors. (*Id.* ¶ 26.)

### C. The Use of Force

It's also undisputed that the school secretary instructed Plaintiff that she needed to leave the office if she was going to continue using profanity. (*DSMF* ¶ 11, Doc. 37-6.) Mrs. Carter then opened the office doors to ask Mr. Carter to come inside the office with her. (*PSMF* ¶ 27, Doc. 45-1.) A secretary standing about 20 to 25 feet away from Deputy Dupuy mouthed something to him.

(*Id.* ¶ 28.) Though he could not hear what the secretary said, Deputy Dupuy believes the secretary said "Hey, she has got to go." (*Id.* ¶ 29.) Jones testified, "Our office secretary requested that Deputy Dupuy remove Mrs. Carter from the office." (Jones Decl. ¶ 11, Doc. 37-3.)

Plaintiff disputes Dupuy and Carter's testimony. Plaintiffs point to the video, which shows (1) that a man (possibly Jones) does not enter into the frame until about ten seconds after Mrs. Carter starts engaging with Dupuy at the door, (Def. Ex. B-1, 1:30:19 p.m.–1:30:33 p.m.), so it's unclear whether Jones heard or saw the secretary, and (2) that the secretary is not visible in the frame during Mrs. Carter's interaction with the deputy, so it's unclear whether Dupuy could have seen the secretary mouthing anything to Dupuy. The Court agrees with Plaintiff that fair inferences from the video are that (1) Jones entered late and never saw or heard the secretary and (2) Dupuy may not have seen the secretary.

In any event, Deputy Dupuy asked Mrs. Carter to step outside. (*DSMF* ¶ 13, Doc. 37-6; *PSMF* ¶ 30, Doc. 45-1.) Mrs. Carter refused to exit the office without her daughter. (*DSMF* ¶ 14, Doc. 37-6; *PSMF* ¶ 31, Doc. 45-1.) The parties disagree about the extent to which Dupuy investigated why Carter was not allowed to pick G.C. up from school or whether G.C. was being kidnapped; Dupuy testified that there was no report of a kidnapping at that moment and that DCFS said to the school don't release G.C. until DCFS got there. (Dupuy Dep. 55–56, Doc. 45-6.) Dupuy did not ask Mrs. Carter why she wanted to leave with her daughter or why she had not been provided her daughter. (*Id.* at 56.) Dupuy highlights what he was told about the situation, described above. (Dupuy Dep. 32, Doc. 37-4.)

In any event, Deputy Dupuy did not tell Mrs. Carter at that moment that she was under arrest or that she would be under arrest if she did not leave. (*PSMF* ¶ 33, Doc. 45-1; Dupuy Dep. 74–76, Doc. 45-6.) Mrs. Carter testified that no one told her she had to leave or that she was

8

forbidden from being inside the school, though the secretary did ask her to step outside. (A. Carter Dep. 72, Doc. 45-4.)

It is undisputed that, less than 20 seconds after first engaging with Mrs. Carter, Deputy Dupuy grabbed and pulled Mrs. Carter's right arm to physically remove her from the office. (*PSMF* ¶ 35, Doc. 45-1.) Mrs. Carter then braced herself and planted her feet down to keep herself in place. (*Id.* ¶ 36.) Deputy Dupuy then shoved Mrs. Carter with both of his hands to fully push her outside. (*Id.* ¶ 37.)

Again, Deputy Dupuy testified that Mrs. Carter was not being arrested at that moment, she was not attempting to flee, and she was not resisting arrest. (*Id.* ¶ 38; *DRSF* ¶ 38, Doc. 49-1.) Mrs. Carter testified, "I was not carrying any kind of weapon with me on February 4, 2022, nor did I threaten to use a weapon or threaten any violence that day." (A. Carter Decl. ¶ 10, Doc. 45-5.) Dupuy likewise testified that no one threatened him with or brandished a weapon at him; Dupuy said he was threatened a couple of times, but he does not specify how or by whom. (Dupuy Dep. 49, Doc. 45-6.)

### D.  After the Use of Force and Treatment for Mrs. Carter's Injuries

After forcibly removing Mrs. Carter from the school office, Deputy Dupuy handcuffed and placed Mrs. Carter in the back of his unit. (*PSMF* ¶ 40, Doc. 45-1.) While there, Mrs. Carter was in pain from where Dupuy had grabbed her arm. (*Id.* ¶ 41.) Mrs. Carter requested medical attention. (*Id.* ¶ 42.) Deputy Dupuy called for Acadian Ambulance and Mrs. Carter was examined at the scene. (*Id.* ¶ 43.) The Carters both testified that Dupuy stated that, if Mrs. Carter went to the hospital that day, a Friday, she would not be able to take care of her disabled daughter because she would not be able to bond out of jail until Monday. (*Id.* ¶ 44.) Dupuy testified, "I told her that if she's transported to the hospital that I would follow them to the hospital, and then once she's

9

released from the hospital, then I would be able to finish my arrest and bring her to jail." (Dupuy Dep. 60, Doc. 45-6.) But Mrs. Carter did not go to the hospital that day and Deputy Dupuy did not take her to jail. (*PSMF* ¶ 46, Doc. 45-1.)

After speaking to an LPSO supervisor on the phone, Deputy Dupuy issued Mrs. Carter a summons for violations of La. R.S. § 14:103, Disturbing the peace, and La. R.S. § 14:63.3, Entry on or remaining in places or on land after being forbidden. (*Id.* ¶ 47.) The misdemeanor charges against Mrs. Carter were dropped without prosecution. (*Id.* ¶ 48.)

Deputy Dupuy never spoke to anyone from DCFS on that day. (*Id.* ¶ 49.) The school released G.C. to the Carters later that day. (*Id.* ¶ 50.) Deputy Dupuy never viewed any order from DCFS or any court that would have permitted the school to keep G.C. from her parents' custody. (*Id.* ¶ 51.)

Mrs. Carter went to urgent care twice after Deputy Dupuy used force against her. (*Id.* ¶ 52.) The first time she went to urgent care for bruising on her upper arm, on February 5, 2022; she was diagnosed with contusions and told not to lift anything heavy. (*Id.* ¶ 53.) She was prescribed three medications: a steroid, a muscle relaxer, and a pain medication. (*Id.* ¶ 54.)

The following day, February 6, 2022, she went to another clinic because she was experiencing swelling, soreness, and tingling in her right wrist. (*Id.* ¶ 55.) At the second clinic, Mrs. Carter got an x-ray of her wrist, which found that it was not broken. (*Id.* ¶ 56.) She was put in a splint for her wrist. (*Id.* ¶ 57.) Mrs. Carter testified that, as a result of the use of force in this case, she had "bruising to her upper arm and soreness" which lasted approximately two weeks (*DSMF* ¶ 16, Doc. 37-6.) She testified that she had tingling and coldness in her wrist as well which lasted about a month. (A. Carter Dep. 51, Doc. 45-4.) Plaintiff submitted photos of her arms:



(Doc. 45-11.)

Defendants maintain that Plaintiff has denied that this bruising is from the incident with Dupuy. Defendants point to the following from Mrs. Carter's February 6, 2022, medical records:

| History of Present Illness: | **Patient Reports:**<br>Pain<br>Wrist pain<br>**Dictation:** Patient presents to clinic with a "possible" two day history of left wrist pain. Patient states that she believes it is from a incident on Friday. (When checking in patient states that she was assaulted by a police offer but now states that this is not from that event. Patient was also seen at Denham North yesterday for a variety of ailments due t the assault. Patient has not filed a report with the police and changes her story multiple times when talking to staff and provider). COmplains of left wrist pain and bruising and swelling. States that there is intermittent tingling feeling. |

(Doc. 46-2 at 7.)

In any event, Mrs. Carter testified that she experienced mental and emotional injuries as a result of the incident with Deputy Dupuy. (*PSMF* ¶ 59, Doc. 45-1.) Mrs. Carter also said she has become anxious and withdrawn, opting to stay home more frequently. (*Id.* ¶ 60.) Mrs. Carter testified that she has completely lost faith in law enforcement's ability to protect her and keep her safe, which was a fundamental belief system she held prior to this incident. (*Id.* ¶ 61.) Mr. Carter testified that his wife is "not who she was before [Deputy Dupuy] did that to her." (*Id.* ¶ 62.)

## III.    SUMMARY JUDGMENT STANDARD

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure, which states that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by[ ] [ ] citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "The movant bears the initial burden and must identify 'those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Pioneer Expl.,*

*L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted)).

However, "the movant 'need not negate the elements of the nonmovant's case.'" *Id.* (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc))). That is, "[a] movant for summary judgment need not set forth evidence when the nonmovant bears the burden of persuasion at trial." *Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 997 (5th Cir. 2019) (citing *Celotex Corp.*, 477 U.S. at 323 ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim.") (emphasis in original)). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Id.* (citing *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002)).

If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . The nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (cleaned up). The non-mover's "burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little*, 37 F.3d at 1075 (cleaned up).

Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991) (cleaned up).

## IV. DISCUSSION: SECTION 1983 EXCESSIVE FORCE CLAIM

### A. Overview of the Law

"Qualified immunity shields government officials performing discretionary functions from civil damages liability 'as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Crittindon v. LeBlanc*, 37 F.4th 177, 185 (5th Cir. 2022), *cert. denied*, 144 S. Ct. 90 (2023) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). "Determining whether an officer is entitled to qualified immunity requires a two-step inquiry." *Id.* "First, we ask whether the officer's alleged conduct has violated a federal right. Second, we ask whether the right in question was clearly established at the time of the alleged violation, such that the officer was on notice of the unlawfulness of his or her conduct." *Id.* at 185–86 (cleaned up). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As to the first prong, "[w]here, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." *Graham v. Connor*, 490 U.S. 386, 394 (1989). "To prevail on an excessive force claim, a plaintiff must establish: '(1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness

of which was clearly unreasonable.'" *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007) (Dennis, J.) (quoting *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005)). More on this standard will be provided below.

As to the second prong, "[i]n determining what constitutes clearly established law, [the Fifth Circuit] first looks to Supreme Court precedent and then to [its] own." *Crittindon*, 37 F.4th at 186 (quoting *Shumpert v. City of Tupelo*, 905 F.3d 310, 320 (5th Cir. 2018)). "When there is no direct controlling authority, '[the Fifth Circuit] may rely on decisions from other circuits to the extent that they constitute a robust consensus of cases of persuasive authority." *Id.* (quoting *Shumpert*, 905 F.3d at 320 (internal quotation marks and citation omitted)). "Ultimately, the touchstone is 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Id.* (quoting *Shumpert*, 905 F.3d at 321 (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002))).

Nevertheless, "[t]o be clearly established, a right must be 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020) (quoting *Mullenix v. Luna*, 577 U.S. 7 (2015) (per curiam)). Courts "do not require plaintiffs to identify a case 'directly on point,' but the case law must "place[ ] the statutory or constitutional question *beyond debate*." *Id.* (quoting *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

## B.  Parties' Arguments

### 1.  Defendants' Original Brief (Doc. 37-1)

Defendants argue that the Court should dismiss Plaintiffs' excessive force claims. (Doc. 37-1 at 11.) First, Plaintiffs have no cognizable Fourteenth Amendment claim, so this is easily dismissed, say Defendants. (*Id.*)

As to the Fourth Amendment claim, Defendants urge that Dupuy's force was not unreasonable or excessive. (*Id.* at 12.) Defendants recap the facts as follows:

> Here, Deputy Dupuy was contacted by school administrators and requested to come to the office because there was a problem. When he arrived, he was informed that parents were headed to the school to pick up their child, but that DCFS had called with directions that, under no circumstances, was the school to release the child to the parents. The school was so concerned over this incident that they began to lock their doors.
>
> Once Mrs. Carter arrived at the school office, she was irate, yelling, and using profanity. School employees told Mrs. Carter that she would need to leave the office if she continued acting this way. When Mrs. Carter continued this behavior, the school secretary requested that Deputy Dupuy remove her from the office. Following her refusal to voluntarily leave the office in response to request by Deputy Dupuy, the deputy grabbed Mrs. Carter's sweater sleeve, at which point she "planted her feet" and resisted leaving the office. Once Deputy Dupuy got her to the door, he pushed her outside of the office.

(*Id.*)

Defendants cite law that Dupuy had a legal right to remove Mrs. Carter, and Plaintiffs cannot show that existing precedent places the question "beyond debate." (*Id.* at 12–13 (citations omitted).) As to the elements of an excessive force claim, (1) any injury Plaintiff suffered— bruising to her upper arm and soreness for two weeks—is *de minimis*, (*id.* at 13–14); and (2) the force was not clearly excessive given Mrs. Carter's "disruptive conduct, the potential threat she

posed, and her refusal to leave after being asked," and Dupuy's minimal use of force after Mrs.

Carter's conduct in planting her feet and bracing herself, (*id.* at 14–15).

Even if Plaintiffs could show a violation of their constitutional rights, they cannot

overcome qualified immunity. (*Id.* at 15.) Again, given Mrs. Carter's behavior and the relatively

slight use of force, Plaintiffs cannot show that every reasonable officer would know the use of

force was illegal. (*Id.* at 16.) And, certainly, the constitutional question here is not settled "beyond

debate." (*Id.*)

> That is, plaintiffs cannot come forward with any case law—much
> less any substantial body of law—that would establish that Deputy
> Dupuy's conduct in grabbing Mrs. Carter's sweater/arm, pulling her
> to the door, and pushing her out of the office violated her right to be
> free from excessive force when she was being disruptive, using
> profanity, and posed a potential threat as highlighted by the DCFS
> agent's instructions not to release her child to her.

(*Id.*)

## 2. *Plaintiffs' Opposition (Doc. 45)*

Plaintiffs begin by asserting that parents have a Fourteenth Amendment right to the care,

custody, and management of their children, who cannot be seized absent a court order, parental

consent, or exigent circumstances. (Doc. 45 at 8.) Here, none of those circumstances are present,

particularly since Mrs. Carter was well within her rights to pick up her child and bring her home

and particularly since Mrs. Carter already wanted to leave the school as soon as she picked up her

child. (*Id.* at 8–9.) "Nor was Ms. Carter a threat to anyone. She did not possess a gun or a knife.

She did not threaten violence or harm to anyone, nor did her demeanor suggest she intended to

resort to violence. Nor does [ ] Dupuy state that he believed Ms. Carter had any weapons." (*Id.* at

9.) Mrs. Carter used profanity once, not at staff and not in the presence of children. (*Id.* at 9–10.)

She was not forbidden from being in the office and was not told she would be arrested if she

remained. (*Id.* at 10.) Thus, there are questions of fact on whether she was disruptive or threatening. (*Id.*)

Plaintiffs next contend that they demonstrate an excessive force claim under the Fourth Amendment. (*Id.* at 10–11.) Mrs. Carter suffered an injury to her wrist that was directly caused by Dupuy's grabbing and shoving that exceeded *de minimis* harm. (*Id.* at 11–12.) Plaintiffs cite Fifth Circuit case law supporting their position and distinguish Defendants' authority. (*Id.*) Plaintiff was physically injured in a way that warranted two urgent care visits, and she continues to experience psychological harm from the use of force. (*Id.* at 12.) Further, the injuries (physical and psychological) were caused directly and only by the use of force. (*Id.* at 13.)

The use of force was also objectively unreasonable. After cataloging caselaw on this issue, Plaintiff relies on the facts that the offense was minor and non-violent; that Mrs. Carter did not pose a threat, possess a gun or knife, nor was she physically intimidating; that she was not being arrested, attempting to flee, or resisting arrest; that Dupuy opted to use force unreasonably fast and lacked a measured and ascending response to Mrs. Carter's non-compliance; and that there is a dispute as to what Dupuy was exactly told about the danger Mrs. Carter posed. (*Id.* at 13–16.)

Plaintiffs then preserve their Fourteenth Amendment excessive force claim. (*Id.* at 16–17.) However, they note that this claim is brought when a person is not seized for purposes of the Fourth Amendment. (*Id.* at 17.) Plaintiffs then continue by arguing the merits of this claim. (*Id.* at 17–18.)

Plaintiffs next turn to qualified immunity. (*Id.* at 19.) Summary judgment is inappropriate when there are conflicting versions of the events, and Mrs. Carter had a clearly established right to be free from excessive force at the time of the incident. (*Id.* at 19–21.) Plaintiffs continue:

> Ms. Carter did not pose a threat, she was not attempting to flee, and she was not resisting arrest as she was not even aware that she was at risk of being arrested at the time that Deputy Dupuy used force against her. Though defendants allege that Ms. Carter posed a threat,

> they have not presented any evidence pointing to Ms. Carter's
> threatening behavior. Like the plaintiff in *Tolan*, Ms. Carter alleges
> only that she used a single profanity directed to her grandmother on
> the phone, not that she had raised her voice or yelled at anyone.
> Moreover, Ms. Carter's use of profanity was only after her
> nonverbal child was being withheld without legal authority.

(*Id.* at 21.)

Plaintiffs next assert that Defendants are not entitled to qualified immunity because the

doctrine was meant for situations where split-second decisions are involved. (*Id.* at 22.) Here,

again, there was no immediate threat or emergency. (*Id.*)

Plaintiffs close this section with the contention that qualified immunity itself is contrary to

the original text of Section 1983. (*Id.* at 23–31.) They argue for the abrogation of the entire

doctrine. (*Id*.)

### 3. Defendants' Reply (Doc. 49)

Defendants begin by arguing that the key issue in this case is whether the force used by

Dupuy was objectively excessive in light of the facts known to him; thus, many of the facts

highlighted by the Plaintiffs—such as the child's condition, the alleged vindictiveness of the

school's complaints against the Carters, and other similar facts that were not known to Dupuy.

(Doc. 49 at 1–2.)

Defendants next contend that Plaintiffs only dispute two key facts, one of which is in fact

not disputed and one of which is immaterial. (*Id.* at 2.) Defendants say it is not disputed that Mrs.

Carter was being disruptive. (*Id.* at 2.) Dupuy was justified in believing she was a threat,

particularly in light of his being told by school administration that DCFS instructed the assistant

principal not to release the child to her. (*Id.* at 2–3.)

Defendants then again reiterate that Mrs. Carter has not established the elements of an

excessive force claim—her alleged injuries are *de minimis*, and, in fact, Mrs. Carter reported that

her injuries may have been caused by a different event. (*Id.* at 3–4.) Further, the use of force was not clearly excessive or unreasonable, particularly in light of the warning school administrators learned about the Plaintiffs, DCFS's instructions not to release the child to them, their precautions in locking the doors, the secretary's request for Dupuy to remove her, and Mrs. Carter's resistance to Dupuy's attempt to do so. (*Id.* at 4–5.) Dupuy's speed was also justified, as, "though [he] did not know the exact threat posed by Mrs. Carter, he knew she posed some threat" and she refused to leave, going beyond mere "passive resistance." (*Id.* at 5–6.)

Further, Plaintiffs haven't satisfied their burden of showing that Dupuy is not entitled to qualified immunity.

> Surely, at a bare minimum, reasonable officers could watch the subject video and, in light of the facts known to Deputy Dupuy, conclude that he was reasonable in removing her from the office. The reality is, Deputy Dupuy was presented with a tense situation involving an apparently serious enough threat to warrant DCFS to conclude that the safety of plaintiff's daughter was at risk, and he acted in a reasonable manner to ensure the safety of those present. Surely, not every reasonable officer would agree that the use of force in this instance was excessive.

(*Id.* at 7.) Plaintiffs have not cited to a case demonstrating "beyond debate" that the use of force was unreasonable. (*Id.*) Defendants then distinguish Plaintiff's authority on this issue. (*Id.* at 8.)

Defendants next make straightforward arguments on certain miscellaneous issues. As to the Fourteenth Amendment claim, Plaintiffs assert this in the event that the Court finds that Mrs. Carter was not seized for purposes of the Fourth Amendment. (*Id.* at 9.) But, Defendants concede that Mrs. Carter was seized, so Plaintiffs have no Fourteenth Amendment claim. (*Id.*) As to the lengthy argument about qualified immunity's viability, Plaintiff's position is against well-settled law in this district, so the Court should summarily reject it. (*Id.*)

### C.  Law and Analysis

Again, "[t]o prevail on an excessive force claim, a plaintiff must establish: '(1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Freeman*, 483 F.3d at 416 (citation omitted). The Court will address each of these elements in turn.

#### 1.  Injury

As to the first prong, "the plaintiff's asserted injury must be more than *de minimis.*" *Freeman*, 483 F.3d at 416 (citing *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001). "The determination of whether a plaintiff's alleged injury is sufficient to support an excessive force claim is context-dependent and is 'directly related to the amount of force that is constitutionally permissible under the circumstances.'" *Id.* at 416–17 (quoting *Ikerd v. Blair*, 101 F.3d 430, 435 (5th Cir. 1996) and citing *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999) ("In determining whether an injury caused by excessive force is more than de minimis, we look to the context in which that force was deployed.")). "Although a showing of 'significant injury' is no longer required in the context of an excessive force claim, '[the Fifth Circuit] do[es] require a plaintiff asserting an excessive force claim to have "suffered at least some form of injury."'" *Glenn*, 242 F.3d at 314 (quoting *Williams*, 180 F.3d at 703); *see also Keele v. Leyva*, 69 F. App'x 659, 2003 WL 21356063, at *1 (5th Cir. 2003) (unpublished) (per curiam) ("The injury must be more than a *de minimis* physical injury[ ] but need not be significant or serious." (citing *Gomez v. Chandler*, 163 F.3d 921, 924 (5th Cir. 1999))). Elaborating on this, the Fifth Circuit has said:

> "[A]lthough a *de minimis* injury is not cognizable, the extent of injury necessary to satisfy the injury requirement is 'directly related to the amount of force that is constitutionally permissible under the circumstances.'" *Brown v. Lynch*, 524 Fed. Appx. 69, 79 (5th Cir. 2013) (quoting [*Ikerd*, 101 F.3d at 434–35)]. "*Any* force found to be objectively unreasonable necessarily exceeds the *de minimis*

> threshold, and, conversely, objectively reasonable force will result in *de minimis* injuries only." *Id.* (emphasis added) (footnote omitted). Consequently, "only one inquiry is required to determine whether an officer used excessive force in violation of the Fourth Amendment." *Ikerd*, 101 F.3d at 434 n.9. In short, "as long as a plaintiff has suffered 'some injury,' even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force." *Brown*, 524 Fed. Appx. at 79 (footnotes omitted) (quoting *Ikerd*, 101 F.3d at 434).

*Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017).

Here, the Court finds that Plaintiff has demonstrated more than *de minimis* injuries. As stated above, she suffered bruising on her upper arm and experienced swelling, soreness, and tingling in her right wrist which necessitated two urgent care visits. (*PSMF* ¶¶ 53–57, Doc. 45-1) It is undisputed that the bruising on her upper arm and soreness lasted approximately two weeks, (*DSMF* ¶ 16, Doc. 37-6), and she testified that the tingling and coolness in her wrist lasted about a month, (A. Carter Dep. 51, Doc. 45-4). The pictures shown above highlight the severity of the bruising. (Doc. 45-11.) She was also prescribed three medications: a steroid, a muscle relaxer, and a pain medication. (*PSMF* ¶ 54, Doc. 45-1.) Further, Plaintiff testified about the mental and emotional injuries she experienced during the encounter which continue to persist. (*PSMF* ¶¶ 59–62, Doc. 45-1.) Under the circumstances, these injuries are more than *de minimis*, particularly in light of the unreasonableness and excessiveness of the force which will be discussed in the next section. *See also Hinson v. Martin*, 853 F. App'x 926, 932 (5th Cir. 2021) (per curiam) ("the relatively minor injury (pain) that Hinson alleges resulted from being kicked, when examined in the context of a subdued, handcuffed, and compliant arrestee, may suffice to meet the injury element of an excessive force claim, if objectively unreasonable."); *Ikerd*, 101 F.3d at 435 (finding sufficient evidence of injury when ten-year-old child suffered "soft tissue injury to her forearm, possible nerve damage, and post-traumatic stress disorder" when a 300-pound deputy "violently

jerked [her] . . . out of her living room chair and dragged her into another room" when she "was not under arrest and posed no threat to anyone" and thus "there was no need to use any physical force against [her]"). *Cf. Buehler v. Dear*, 27 F.4th 969, 983 (5th Cir. 2022) (finding injuries *de minimis* when "any lacerations [plaintiff] suffered were so minor as to be essentially invisible" and when plaintiff admitted that "he did not physically suffer 'anything beyond . . . bruising and pain,' for which he did not seek medical attention while in jail or the day he was released (and apparently was never prescribed any treatment except 'self-care' and 'ibuprofen or something').""). Consequently, this part of Defendants' motion is denied.

### 2. *Excessiveness and Reasonableness of the Force*

#### a. Applicable Law

As to the second prong—that the injury "resulted directly and only from a use of force that was *clearly excessive*," *Freeman*, 483 F.3d at 416 (emphasis added)—the Fifth Circuit "distinguish[es] between injuries resulting from excessive force and those resulting from the justified use of force." *Dunn v. Denk*, 79 F.3d 401, 403 (5th Cir. 1996) (en banc) (citation omitted). "A trier of the fact can compensate only for injury caused by the use of excessive force. There can be no award for injury caused by reasonable force." *Id.* Thus, there is no bar to "recovery for aggravation of preexisting injury caused by the use of excessive force." *Id.*

As to the third prong, "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (cleaned up). "Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Deville v. Marcantel*, 567 F.3d 156, 167

(5th Cir. 2009) (quoting *Graham*, 490 U.S. at 396, and citing *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (observing that this "area is one in which the result depends very much on the facts of each case")). "Factors to consider include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396). "[T]he question is 'whether the totality of the circumstances justifie[s] a particular sort of . . . seizure.'" *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).

"As in other Fourth Amendment contexts [ ], the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (citations omitted). "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.*

Additionally, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* (cleaned up). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

Nevertheless, "a constitutional violation occurs when an officer tases, strikes, or violently slams an arrestee who is not actively resisting arrest," and Fifth Circuit "case law makes clear that

when an arrestee is not actively resisting arrest the degree of force an officer can employ is reduced." *Darden v. City of Fort Worth*, 880 F.3d 722, 731 (5th Cir. 2018) (citations omitted). For example, in *Bush v. Strain*, 513 F.3d 492 (5th Cir. 2008), the appellate court found that "it was objectively unreasonable for an officer to slam an arrestee's face into a vehicle when the arrestee 'was not resisting arrest or attempting to flee.'" *Darden*, 880 F.3d at 731 (quoting *Bush*, 513 F.3d at 502). "Similarly, in [*Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012)], [the Fifth Circuit] found that it was objectively unreasonable for officers to tase and strike an arrestee with a nightstick without resorting to less violent means when the arrestee's 'behavior did not rise to the level of "active resistance."'" *Id.* (quoting *Newman*, 703 F.3d at 763). *Compare Buehler*, 27 F.4th at 983– 84 (finding plaintiff who took several steps backwards away from officers immediately after officer told him to turn around and that he was under arrest and who "lurched forward in an attempt to get away" was "actively resist[ing] arrest" for purposes of excessive force analysis), *with Deville*, 567 F.3d at 167 (finding the district court erred in granting summary judgment because "there [wa]s a factual dispute over the nature of Deville's resistance" in that, according to her version, "her resistance was, at most, passive in that she merely refused to leave her grandchild and exit the vehicle until Mr. Deville came to get the child—not that she affirmatively, physically resisted as the officers contend.").

"Yet another consideration bearing upon the reasonableness of an arresting officer's use of force is whether it involved measured and ascending responses to a suspect's noncompliance." *Buehler*, 27 F.4th at 984 (cleaned up). Thus, in *Buehler*, the Court explained that an officer was entitled to qualified immunity when the plaintiff "relentlessly followed around officers for hours, disobeying their repeated and unambiguous commands that he step back at least arm's length away so as not to block the Officers' field of vision." *Id.* at 984–85.

But, "officers must assess not only the need for force, but also 'the relationship between the need and the amount of force used.'" *Deville*, 567 F.3d at 167 (quoting *Gomez*, 163 F.3d at 923). Thus, in *Deville*, the Fifth Circuit found that "a jury could reasonably find that the degree of force the officers used in this case was not justifiable under the circumstances" (1) because the officer "engaged in very little, if any, negotiation with [the plaintiff]" but "instead quickly resorted to breaking her driver's side window and dragging her out of the vehicle" and (2) because "[b]oth parties' experts agree[d] that continued negotiations [were] more appropriate than actual force where the suspect is only stopped for a minor traffic offense and is making no attempt to flee." *Deville*, 567 F.3d at 167–68.

Returning to the *Graham* factors as a whole, in *Hanks v. Rogers*, 853 F.3d 738, 749 (5th Cir. 2017), the Fifth Circuit held that an officer was not entitled to qualified immunity when "all of [the *Graham*] factors strongly favored" the plaintiff. The appellate court stated:

> We hold that on Feb. 26, 2013, clearly established law demonstrated, and *Graham* makes obvious, that it was clearly unreasonable and excessive for Officer Rogers to abruptly escalate the encounter via a physical takedown where (1) Officer Rogers stopped Hanks for a minor traffic offense; (2) immediately before the takedown, Officer Rogers had his taser aimed at Hanks's back while Hanks stood against his vehicle, facing away from Officer Rogers, with his empty hands displayed behind his back, presenting no immediate threat or flight risk; and (3) Hanks offered, at most, passive resistance, including asking whether he was under arrest.

*Id.* at 749–50. Significantly, the "passive" resistance "consisted chiefly of remaining on his feet for about twenty seconds after [the officer's] first order to kneel" and taking a "small lateral step with his left foot" either before or simultaneously with the use of force, but, either way, the "step was not accompanied by any obvious signs of violence or flight." *Id.* at 746.

Similarly, in *Deville*, the Fifth Circuit found sufficient evidence to deny qualified immunity based on the following:

26

> [T]his case involved: a traffic stop for a minor traffic offense unsupported by probable cause; Deville's passive resistance to being removed from her car and separated from her grandchild, in compliance with her well-established rights under state law to resist an unlawful arrest (i.e., an arrest unsupported by probable cause); the officer's threat of calling child protective services despite no indication that the child was in distress or that Deville intended to flee; an officer who others said smelled of alcohol beating on Deville's driver's window with a heavy flashlight and breaking the window; a rough extraction of Deville from the vehicle by both officers, causing a forceful blow to Deville's abdomen; and handcuffs applied so tightly that they caused severe nerve damage.

*Deville*, 567 F.3d at 169. "These alleged facts are sufficiently egregious to warrant a denial of qualified immunity because a reasonable officer would have known that the degree of force was unconstitutionally excessive under the circumstances." *Id.*

b.  Analysis

Having carefully considered the matter, the Court will deny Defendants' motion. In sum, when construing the evidence in a light most favorable to Plaintiffs and when drawing reasonable inferences in their favor, a reasonable jury could easily conclude that Dupuy employed unreasonable and excessive force against Mrs. Carter and that he had fair notice that his conduct was unlawful under clearly established law.

First, when giving the evidence the above construction, all of the *Graham* factors weigh strongly in Mrs. Carter's favor. The violations at issue (disturbing the peace and entry on or remaining in a place after being forbidden) are minor crimes for which the misdemeanor charges were ultimately dismissed. (*PSMF* ¶ 47–48, Doc. 45-1.)

Moreover, a reasonable jury could conclude that Mrs. Carter did not "pose[ ] an immediate threat to the safety of the officers or others[.]" *Deville*, 567 F.3d at 167 (citations omitted). Mrs. Carter testified that she was not carrying a weapon with her, nor did she use a weapon or threaten violence that day. (A. Carter Decl. ¶ 10, Doc. 45-5.) Dupuy likewise testified that no one threatened

him with or brandished a weapon at him; he simply says he was threatened verbally a couple of times, though he does not say how or by whom. (Dupuy Dep. 49, Doc. 45-6.) Mrs. Carter testified she used one swear word that day, (A. Carter Dep. 75, Doc. 37-5), and she did not raise her voice in the school office, (Carter Decl. ¶ 9, Doc. 45-5). Dupuy was told that "We have a problem in the front office. You need to come up here. . ." (*DSMF* ¶ 7, Doc. 37-6.); that he needed to be "on alert," (Jones Decl. ¶ 6, Doc. 37-3); and that DCFS instructed the school not to release G.C. to the parents, (Dupuy Dep. 32, Doc. 37-4). However, Deputy Dupuy could not hear the conversation in the office from outside the closed door, (*PSMF* ¶ 26, Doc. 45-1), and a fair construction of the video shows that Mrs. Carter is upset but not otherwise making a disturbance or scene or threatening anyone at the time force was applied.

The third *Graham* factor also supports Plaintiffs; at the time force was used, Mrs. Carter was not "actively resisting *arrest* or attempting to evade *arrest* by flight." *Deville*, 567 F.3d at 167 (emphasis added) (citations omitted). Indeed, Plaintiff submits evidence that, at the time Dupuy asked her to step outside, Dupuy did not tell Mrs. Carter that she was under arrest or that she would be under arrest if she did not leave. (*PSMF* ¶ 33, Doc. 45-1; Dupuy Dep. 74–76, Doc. 45-6.) Further, Mrs. Carter testified that no one told her she had to leave or that she was forbidden from being inside the school, though the secretary did ask her to step outside. (A. Carter Dep. 72, Doc. 45-4.) Moreover, Deputy Dupuy testified that, at the time he pulled and pushed Mrs. Carter, she was not being arrested at that moment, she was not attempting to flee, and she was not resisting arrest. (*PSMF* ¶ 38, Doc. 45-1; *DRSF* ¶ 38, Doc. 49-1.) Thus, Mrs. Carter was not resisting *arrest* or posing a flight risk.

Even putting this aside, a reasonable jury could easily conclude that the minimal resistance Mrs. Carter displayed was more appropriately characterized as "passive resistance." It is

undisputed that, less than 20 seconds after first engaging with Mrs. Carter, Deputy Dupuy grabbed and pulled Mrs. Carter's right arm to physically remove her from the office. (*PSMF* ¶ 35, Doc. 45-1.) Mrs. Carter then braced herself and planted her feet down to keep herself in place. (*Id.* ¶ 36.) Deputy Dupuy then shoved Mrs. Carter with both of his hands to fully push her outside. (*Id.* ¶ 37.)

This is similar to *Hanks*, where the "passive" resistance "consisted chiefly of remaining on his feet for about twenty seconds after [the officer's] first order to kneel" and taking a "small lateral step with his left foot" either before or simultaneously with the use of force, but where that "step was not accompanied by any obvious signs of violence or flight." 853 F.3d at 746. Mrs. Carter's extraordinarily minor feet planting is also comparable to *Deville*, where the plaintiff's "resistance was, at most, passive in that she merely refused to leave her grandchild and exit the vehicle until [her husband] came to get the child—not that she affirmatively, physically resisted as the officers contend." *Deville*, 567 F.3d at 167.

This is particularly true in light of the fact that Dupuy's use of force did not involve "measured and ascending responses to a suspect's noncompliance." *Buehler*, 27 F.4th at 984 (cleaned up). As in *Deville*, Dupuy "engaged in very little, if any, negotiation with" Mrs. Carter and "instead quickly resorted" to the pull and shove. *See Deville*, 567 F.3d at 167–68; *PSMF* ¶ 35, Doc. 45-1. As in *Deville*, "negotiations [were] more appropriate than actual force where the suspect [wa]s only stopped for a minor [ ] offense and [wa]s making no attempt to flee." *Deville*, 567 F.3d at 167–68. Considering all of the evidence, again in a light most favorable to Plaintiffs with reasonable inferences drawn in their favor, a reasonable jury could easily conclude that Dupuy's use of force was objectively unreasonable and excessive.

Additionally, when viewing the evidence this way, the Court finds that Plaintiffs have overcome qualified immunity. Again, "[u]ltimately, the touchstone is 'fair warning': The law can

be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Crittindon*, 37 F.4th at 186 (citations omitted). And here, considering how strongly the *Graham* factors weigh in Plaintiffs' favor, as in *Hanks* and *Deville*, the Court finds that Dupuy had "reasonable warning that [his] conduct . . . violated constitutional rights." *See id.*

Defendants raise in their reply the argument that any injuries were not the result of excessive force but rather another incident, but the Court finds that this is not the proper construction of the evidence. Again, Mrs. Carter's medical records for the *second* visit provided:

| History of Present Illness: | **Patient Reports:**<br>Pain<br>Wrist pain<br>**Dictation:** Patient presents to clinic with a "possible" two day history of left wrist pain. Patient states that she believes it is from a incident on Friday. (When checking in patient states that she was assaulted by a police offer but now states that this is not from that event. Patient was also seen at Denham North yesterday for a variety of ailments due t the assault. Patient has not filed a report with the police and changes her story multiple times when talking to staff and provider). COmplains of left wrist pain and bruising and swelling. States that there is intermittent tingling feeling. |
|---|---|

(Doc. 45-2 at 7.)

However, when construing this evidence in a light most favorable to Plaintiffs and drawing reasonable inferences in their favor, this document, at most, shows questions of fact about whether her injuries were caused by Dupuy and not something else. That is, a reasonable juror could conclude from the evidence in the record—including that she suffered bruising on her upper arm and experienced swelling, soreness, and tingling in her right wrist which necessitated *two* urgent care visits (and not just the one quoted above) and three prescriptions, (*PSMF* ¶¶ 53–57, Doc. 45-1), and that the bruising on her upper arm and soreness lasted approximately two weeks, (*DSMF* ¶ 16, Doc. 45-1)—that Mrs. Carter suffered injuries which "resulted directly and only from a use

of force that was clearly excessive," *Freeman*, 483 F.3d at 416. Thus, summary judgment remains improper on this issue.

Finally, Defendants do prevail on two issues. First, given Plaintiffs' statement that their Fourteenth Amendment claim is made "[o]ut of an abundance of caution" and that it applies to "a plaintiff whose claim is not susceptible to proper analysis with reference to a specific constitutional right . . ." (Doc. 45 at 17), and given Defendants' concession that Plaintiff was seized under the Fourth Amendment, (Doc. 49 at 9), the Court agrees that Plaintiffs' Fourteenth Amendment claim must be dismissed.

Second, the Court rejects Plaintiffs' attempt to invalidate qualified immunity as a whole. In *Abshire v. Livingston Parish*, No. 22-548, 2023 WL 3589657 (M.D. La. May 22, 2023), this Court stated:

> Nevertheless, this Court's own feelings toward qualified immunity are ultimately irrelevant; Plaintiffs' arguments are best left for the Supreme Court or the Fifth Circuit sitting en banc, not for a district court. *See Planned Parenthood of Greater Tex. Fam. Plan. & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347, 369 (5th Cir. 2020) ("It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our en banc court.") (quoting *Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008) (emphasis omitted)); *see also* [*Conners v. Pohlmann*, No. 15-101, 2021 WL 1172534, at *5 (E.D. La. Mar. 29, 2021) (Barbier, J.)] ("declin[ing] Plaintiffs invitation to find that" the Supreme Court overruled the doctrine of qualified immunity "implicitly") (citing *Nat'l Coal. for Men v. Selective Serv. Sys.*, 969 F.3d 546, 550 (5th Cir. 2020) ("[L]ower courts may not 'conclude [that] recent cases have, by implication, overruled an earlier precedent.' ") (quoting *Agostini v. Felton*, 521 U.S. 203, 237 (1997))). Or, as Judge Willett said, "Today's decision upholding qualified immunity is compelled by our controlling precedent." [*Rogers v. Jarrett*, 63 F.4th 971, 979 (5th Cir. 2023)] (Willett, J., concurring). Accordingly, the Court rejects Plaintiffs' attempt to invalidate the doctrine of qualified immunity.

*Id.* at *10. *See also Mallory v. Norfolk S. Ry. Co.*, 143 S. Ct. 2028, 2030 (2023) ("If a precedent of this Court has direct application in a case, . . . a lower court should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." (cleaned up)); *United States v. Alkheqani*, 78 F.4th 707, 726 (5th Cir. 2023) (declining to find that recent Supreme Court case abrogated prior cases and relying in part on *Mallory*); *Clark v. Hotard*, No. 22-326, 2024 WL 3566695, at *4–5 (M.D. La. July 29, 2024) (deGravelles, J.) (relying on *Mallory*, *Alkheqani*, and *Abshire* and reaching same result). Thus, the Court finds that there is no basis for this Court to invalidate qualified immunity as a viable defense.

   With those two minor issues aside, Plaintiffs' Fourth Amendment excessive force claim survives for trial. Thus, the heart of Defendants' motion will be denied.

## V.   DISCUSSION: STATE LAW CLAIMS

### A.   Parties' Arguments

   Defendants next argue that the question for Plaintiffs' battery claim is not whether Dupuy subjected Mrs. Carter to a harmful or offensive contact but rather whether the force was reasonable under the circumstances or clearly inappropriate—that is, the exact standard used for the Fourth Amendment analysis. (Doc. 37-1 at 17–18.) Defendants say that Plaintiffs' claim should be dismissed, for the same reasons given in the previous section. (*Id.*)

   Likewise, the claims against Sheriff Ard—for vicarious liability and for failure to screen and/or train Dupuy—should be dismissed. (*Id.* at 18.) Each of these claims is dependent on an underlying claim for false arrest or excessive force, so, if the battery claim fails, these two do as well. (*Id.*) But, even if the excessive force claim survives, Sheriff Ard is entitled to the discretionary acts immunity of La. R.S. § 9:2798.1 (*Id.* at 18–19.) Training and supervision policies both fall within the statute's ambit. (*Id.* at 19.)

Plaintiffs respond that their state law claim of negligent use of excessive force is not coextensive with their § 1983 claim, as the latter involves the heightened burden of qualified immunity. (Doc. 45 at 32.) The question here is whether Dupuy's conduct was unreasonable under the totality of the circumstances. (*Id.*) The Court should apply the four factors set forth in *Kyle v. City of New Orleans*, 353 So. 2d 969 (La. 1977), and, under those factors, Plaintiff survives summary judgment. (*Id.* at 32–33.) Plaintiffs then reiterate the facts described above. (*Id.* at 33–34.) For the same reasons, Dupuy is liable for an assault and battery under the *Kyle* factors. (*Id.* at 34–35.) And Sheriff Ard is vicariously liable for Dupuy's actions. (*Id.* at 35–36.) Finally, Plaintiffs do not object to the dismissal of their claims against Ard for failure to screen or train, as these are largely redundant to the *respondeat superior* claims. (*Id.* at 36.)

In reply, Defendants urge that the same reasons which support dismissal of the Fourth Amendment claim favor dismissal of the state law claims. (Doc. 49 at 9.) Again, Dupuy's use of force was reasonable, so there can be no claim for negligence, assault, or battery. (*Id.* at 9–10.)

## B. Claims against Dupuy

### 1. Applicable Law

The Court laid out the law governing these state law claims in *Imani v. City of Baton Rouge*, 614 F. Supp. 3d 306, 381–83 (M.D. La. 2022) (deGravelles, J.), and it is to that opinion that the Court will turn for the relevant standards.

Louisiana Code of Criminal Procedure Article 220 provides, "A person shall submit peaceably to a lawful arrest. The person making a lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained." La. Code Crim. Proc. art. 220. "The use of force by law enforcement officers must be tested by the 'reasonable force' standard established by this article. The test

precludes 'clearly inappropriate force.'" *Kyle*, 353 So. 2d at 972 (quoting La. Code Crim. Proc. art. 220, Official Revision Comment (b)).

"The use of force when necessary to make an arrest is a legitimate police function." *Id.* "But if the officers use unreasonable or excessive force, they and their employer are liable for any injuries which result." *Id.* (citations omitted); *see also Penn v. St. Tammany Par. Sheriff's Off.*, 2002-0893 (La. App. 1 Cir. 4/2/03), 843 So. 2d 1157, 1161 (stating that excessive force transforms authorized use of force into a battery). "Whether the force used is reasonable depends upon the totality of the facts and circumstances in each case." *Kyle*, 353 So. 2d at 973. "A court must evaluate the officers' actions against those of ordinary, prudent, and reasonable men placed in the same position as the officers and with the same knowledge as the officers." *Id.* "The degree of force employed is a factual issue." *Id.* (citations omitted).

The Louisiana Supreme Court has explained further:

> Several factors to be considered in making this determination are the known character of the arrestee, the risks and dangers faced by the officers, the nature of the offense involved, the chance of the arrestee's escape if the particular means are not employed, the existence of alternative methods of arrest, the physical size, strength, and weaponry of the officers as compared to the arrestee, and the exigencies of the moment.

*Kyle*, 353 So. 2d at 973 (citations omitted).

Ultimately, "excessive force claims under both federal and Louisiana law turn on whether the use of force was objectively reasonable given the totality of the circumstances. This has been widely recognized by [the Fifth Circuit], Louisiana federal district courts, and the Louisiana Supreme Court." *Shepherd on behalf of Est. of Shepherd v. City of Shreveport*, 920 F.3d 278, 286 (5th Cir. 2019) (collecting cases).

### 2. *Analysis*

Having carefully considered the matter, the Court will deny Defendants' motion, largely for the same reasons given for the federal excessive force claim. In short, questions of fact preclude summary judgment.

Construing the evidence in a light most favorable to Plaintiffs and drawing reasonable inferences in their favor, a reasonable jury could easily conclude that the force used in this case was excessive and that Dupuy failed to act as a reasonably prudent officer. Again, the risk Dupuy faced was minimal, the offense involved was minor, there's no evidence that Mrs. Carter was a flight risk, Dupuy failed to employ alternate methods during the twenty-second encounter to ensure compliance (including continued negotiations), Dupuy did not believe Mrs. Carter possessed a dangerous weapon, and the exigencies of the moment did not justify the use of force. *See Kyle*, 353 So. 2d at 973 (citations omitted).

"In sum, looking at the totality of the circumstances from the facts presented by Plaintiffs, a reasonable factfinder could conclude that the arresting officers employed 'clearly inappropriate force' to [Mrs. Carter]. Consequently, Defendants' motion will be denied." *See Imani*, 614 F. Supp. 3d at 381–83 (denying negligence, assault, and battery claims for same reasons given for federal claims).

### C. Claims against Sheriff Ard: Law and Analysis

Louisiana Civil Code article 2320 provides that "an employer is subject to vicarious liability for the tortious conduct of his employee, irrespective of his title, while acting within the course and scope of employment." *Tutrix on behalf of DCJH v. Travis*, 595 F. Supp. 3d 488, 513 (M.D. La. 2022) (deGravelles, J.) (citing *Brasseaux v. Town of Mamou*, 752 So. 2d 815, 821 (La. 2000)). "Governmental entities 'do not enjoy special protection from vicarious liability under

Louisiana law and are subject to *respondeat superior* like every other employer.'" *Id*. (quoting *Deville*, 567 F.3d at 174 (citing *Brasseaux*, 752 So. 2d at 815)); *see also Bussey v. Dillard Dep't. Stores, Inc.*, 984 So. 2d 781, 784 (La. App. 1 Cir. 2008) ("[V]icarious liability [under art. 2320] applies to law enforcement employers as well." (citations omitted)). Thus, where it is undisputed that the officer was acting in the course of scope of employment with the sheriff's office when the incident occurred, and where the plaintiff has a claim for negligence against the officer, the plaintiff also has a claim for vicarious liability against the sheriff. *See id.*

Here, Defendants do not dispute that Dupuy was in the course and scope of employment when the incident occurred. Consequently, because there are questions of fact on Dupuy's liability, there are also questions of fact on Plaintiffs' vicarious liability claim against Sheriff Ard. The motion will be denied in this respect.

However, Plaintiffs' claim of negligent screening and training will be dismissed, based on Plaintiff's concession.

**[*intentionally left blank*]**

## VI.    CONCLUSION

Accordingly,

**IT IS ORDERED** that the *Motion for Summary Judgment* (Doc. 37) by defendants Jason Ard, Sheriff of Livingston Parish, State of Louisiana, and Chad Dupuy is **GRANTED IN PART** and **DENIED IN PART.** The motion is **GRANTED** in that the following claims will be **DISMISSED WITH PREJUDICE**: (1) the § 1983 claim for a Fourteenth Amendment violation against Dupuy, and (2) the state law claim for negligent training and screening against Sheriff Ard. In all other respects, Defendants' motion is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>March 24, 2025</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**